## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

BNSF LOGISTICS, LLC                                                    **PLAINTIFF**

V.                          **CASE NO. 5:16-CV-05067**

PENNSYLVANIA MANUFACTURERS
ASSOCIATION INSURANCE COMPANY and
NATIONAL INDEMNITY COMPANY                          **DEFENDANTS**

AND

PENNSYLVANIA MANUFACTURERS
ASSOCIATED INSURANCE COMPANY           **THIRD PARTY PLAINTIFF**

V.

SAINT TRANS, INC.                           **THIRD PARTY DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Currently before the Court are two Motions for Summary Judgment, which have now been fully briefed and are ripe for decision. One Motion was filed by Defendant Pennsylvania Manufacturers Association Insurance Company ("PMAIC") and the other was filed by Defendant National Indemnity Company ("NIC"). In deciding these Motions, the Court reviewed the following:

- PMAIC's Motion for Summary Judgment (Doc. 34), Brief in Support (Doc. 35), and Statement of Facts (Doc. 36); Plaintiff BNSF Logistics, LLC's ("BNSF") Response in Opposition (Doc. 41) and Statement of Facts (Doc. 42); and PMAIC's Reply (Doc. 46); and

- NIC's Motion for Summary Judgment (Doc. 37), Brief in Support (Doc. 38), and Statement of Facts (Doc. 39); BNSF's Response in Opposition (Doc. 43)

1

and Statement of Facts (Doc. 44); and NIC's Reply (Doc. 47).

For the reasons explained herein, the Court **GRANTS** both Motions.

## I. BACKGROUND

This lawsuit stems from a single-vehicle accident involving a tractor-trailer that was carrying infant formula from Michigan to Arizona. The infant formula was manufactured by Abbott Laboratories ("Abbott") and shipped from its facility in Michigan. The tractor-trailer was driven by an employee of Third Party Defendant Saint Trans, Inc. ("Saint Trans"), which is a transportation company. On December 17, 2014, while the tractor-trailer was in transit, somewhere around Las Cruces, New Mexico, the truck overturned, and the infant formula spilled out onto the highway and surrounding area.

To understand the parties' relationship to the issues here, it is necessary to explain exactly how Abbott's infant formula ended up in Saint Trans' tractor-trailer. Beginning in October of 2014, Abbott entered into a "Third Party Logistics Provider Agreement" with Plaintiff BNSF, (Doc. 34-1), through which BNSF agreed to serve as Abbott's property broker. This role required BNSF to arrange for the transportation of Abbott's products across state lines, by contracting with motor carriers that would agree to transport the products to their assigned destinations, while "exercis[ing] standard industry shipping and material handling practices to protect Abbott product integrity." *Id.* at p. 3.

Here, BNSF hired a transportation company called Red Rose Trans, Inc. ("Red Rose") to perform the delivery. BNSF had previously entered into a Carrier Agreement (Doc. 34-3) with Red Rose that stated, quite explicitly, that Red Rose agreed it would "not broker, interline, co-broker, assign or trip lease loads with another party and shall transport

2

all tendered loads . . . on equipment insured, placarded and controlled by [Red Rose]." *Id.* at p. 1. Red Rose also agreed "to transport all shipments provided under this Agreement without delay," to "furnish all equipment necessary or required for the performance of its obligations," to "utilize only competent, able and licensed personnel," and to "have full control of such personnel." *Id.* In addition, Red Rose understood it was "to be named on the bill of lading as the carrier of record" and was to submit a signed proof of delivery to BNSF, as well as any invoices." *Id.*

Red Rose then entered into a "Spot Contract" with BNSF for the delivery of the infant formula. *See* Doc. 34-4. This Spot Contract set forth the particulars of the delivery, including the date and time that Red Rose's driver would collect the cargo from Abbott in Sturgis, Michigan, and the expected date and time the cargo was to arrive at the Central Arizona Distribution Center in Casa Grande, Arizona. *Id.* at p. 1. According to the Spot Contract, Red Rose's driver was required to sign the bill of lading, and the bill of lading was to list Red Rose as the carrier. *Id.* at p. 2. Also, the Spot Contract reminded Red Rose that it was not permitted to "re-broker, sub-broker, subcontract, assign, interline, or warehouse any shipments hereunder without the prior written consent from [BNSF]." *Id.* at p. 2.

As the reader has surely surmised, Red Rose did not transport the infant formula on that ill-fated day. Instead, in apparent disregard of both the Carrier Agreement and the Spot Contract, Red Rose subcontracted the delivery to another trucking company, Saint Trans, whose driver picked up the formula from Abbott, signed the bill of lading, and proceeded to drive the product to Arizona, along the way overturning his tractor-trailer and

causing the cargo to be strewn across the New Mexico highway.

After the accident, BNSF asked both Red Rose and Saint Trans to pay Abbott directly for the damaged cargo, but both companies refused. So BNSF assumed primary responsibility and paid Abbott the full amount of its loss, totaling $121,523.32, and pursued both Red Rose and Saint Trans for reimbursement. It turned out that both trucking companies were insured. Saint Trans was insured by Defendant PMAIC, to whom notice was provided on January 8, 2015, of the accident and the resulting damage to the cargo. On January 27, 2015, PMAIC's agent sent a letter to Saint Trans denying coverage, but offering the following caveat:

> This Denial of Coverage is not exclusive but is rather the specific reasons of which PMAIC is presently aware. By virtue of this correspondence, PMAIC intends to reserve their rights on all grounds, not only those set forth in this letter. PMAIC expressly reserves the right to supplement, amend, modify or expand this Denial of Coverage for any additional reason as it may apply to any new facts or circumstances.
>
> In the event you have any other information or documentation, which you want us to consider, immediately forward such information to our office. In the event any additional information or documentation would suggest that coverage would be afforded under the Terms and Conditions of this Policy, PMAIC expressly reserves the right to assert other and further grounds for denial in response to such information.

(Doc. 34-7, pp. 2-3).

Red Rose was insured by Defendant NIC. However, the record is devoid of documentation to suggest that Red Rose submitted BNSF's claim for damages to NIC after the accident. Instead, the Amended Complaint claims that NIC was made aware of the facts giving rise to the instant action "at least [in] March 2015 . . . ." (Doc. 21, p. 2). But NIC's Answer admits only that "it assigned Claim No. 70-30-334798 to its investigation of the claim," but does not admit it was aware as of March. (Doc. 27, p. 2, ¶ 6).

4

After some period of time, BNSF determined that it was unable to adequately resolve its claim for reimbursement and filed a lawsuit against both Red Rose and Saint Trans—but not PMAIC or NIC—on June 11, 2015, in the Circuit Court of Washington County, Arkansas ("the state court case"). In the state court case, BNSF sued the trucking companies, jointly and severally, for the damages that BNSF sustained in connection with the loss of Abbott's infant formula shipment. The complaint specifically alleged that Red Rose was liable to BNSF on the following three causes of action: (1) breach of contract, due to Red Rose's decision to rebroker and reassign the delivery of the cargo to Saint Trans; (2) negligent hiring of Saint Trans; and (3) vicarious liability—on a *respondeat superior* theory—because Red Rose assumed responsibility for Saint Trans' driver when Red Rose "agreed to be, and was listed as, the carrier for the load that was destroyed," (Doc. 34-2, p. 7). The state court complaint also asserted a single claim for common-law negligence against Saint Trans.

On July 30, 2015, BNSF moved for default judgment against both Red Rose and Saint Trans in state court. (Doc. 34-9). Neither defendant had filed an answer or other responsive pleading. On August 18, 2015, the state court entered judgment in BNSF's favor, finding that the complaint was properly served upon Red Rose and Saint Trans, that both companies failed to appear and defend themselves in the lawsuit, and that "[d]efendant Red Rose is liable to plaintiff BNSF for breach of contract, negligent hiring of defendant Saint Trans, as well as negligent training, supervision and entrustment of the cargo to defendant Saint Trans all of which directly and proximately caused the damages and losses sustained by plaintiff BNSF in the total amount of $121,523.32." (Doc. 3-1, p. 2). The court further determined that "defendant Saint Trans is liable to BNSF for

negligence in failing to safely transport and deliver the cargo which directly and proximately caused the damages and losses sustained by plaintiff BNSF in the total amount of $121,523.32." *Id.* at pp. 2-3.  BNSF received awards of pre- and post-judgment interest, as well as attorneys' fees in the amount of $12,236.50.  *Id.* at p. 3.

On February 17, 2016, approximately six months after default judgment entered, BNSF filed a lawsuit in state court against PMAIC only, seeking to collect on the default judgment under Ark. Code Ann. § 23-89-101.  This provision of the Arkansas Code allows a party that has been injured by a insured person to maintain a direct cause of action against the insurer.  In doing so, the injured party may seek to collect, by way of subrogation, the amount of the judgment that was entered against the insured through the coverage afforded by the insurance policy.  *See id.*

On March 17, 2016, PMAIC removed the case to this Court, asserting federal diversity jurisdiction.  Several months later, on July 19, 2016, PMAIC filed a Third Party Complaint against Saint Trans, (Doc. 15), seeking a declaratory judgment that the policy of insurance issued by PMAIC to Saint Trans affords no coverage.  Saint Trans never responded to the Third Party Complaint, and the Clerk's Office entered a default. *See* Doc. 49.  On July 27, 2016, BNSF filed an Amended Complaint and added NIC as a new Defendant, asserting against it a demand for payment of its default judgment pursuant to Ark. Code Ann. § 23-89-101, and contending that NIC should pay jointly and severally with PMAIC, according to the limits of the policies of insurance at issue.

The Court issued an Amended Case Management Order (Doc. 30) on September 14, 2016, setting forth deadlines by which the parties could file motions for summary judgment as to the issue of coverage.  Both PMAIC's and NIC's Motions were filed on the

same date.  Now that the Motions are ready for resolution, the Court will begin its discussion by reviewing the applicable legal standard, followed by an analysis of the merits of PMAIC's Motion first, and NIC's Motion second.

## II.  LEGAL STANDARD

The standard of review for summary judgment is well established.  Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997).  The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).  Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary

judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III.  DISCUSSION

#### A.  PMAIC's Motion for Summary Judgment

PMAIC believes it is entitled to summary judgment because the policy of insurance it issued to Saint Trans does not cover the loss that was the subject of BNSF's default judgment.  The relevant Policy is located at Doc. 4-1.  PMAIC argues that no coverage is owed because: (1) the cargo at issue was not "Covered Property," as that term is defined in the Policy; (2) no "approved" bill of lading was issued by Saint Trans for the shipment of the cargo at issue; and (3) Saint Trans failed to comply with a condition precedent to coverage, namely, that it notify PMAIC of any pending legal action connected with a claim. As the Court finds that summary judgment is appropriate based on the third argument above, this Order will not discuss the first and second arguments concerning the interpretation of the Policy's language.

The Court agrees that Saint Trans failed to comply with a condition precedent to coverage, and summary judgment on the issue of coverage should be granted on that basis.  In the Policy, under the heading "Loss Conditions," there appears a sub-heading entitled "Duties in the Event of Loss," after which are listed ten obligations that the insured "must see . . . are done."  (Doc. 4-1, p. 11).  The ninth numbered duty is as follows:

> Immediately send us copies of any demands, notices, summonses, or legal papers received in connection with the claim or suit.

*Id.* Later on in the policy, under the heading entitled "General Conditions," a sub-heading called "Legal Action Against Us" clarifies that no legal action may be brought against PMAIC for coverage under the Policy unless "[t]here has been full compliance with all the terms of this Coverage Part . . . ." *Id.* at p. 12.  Reading these two sections of the Policy together, the contract unambiguously provides that the insured has a duty to provide notice of a pending legal action to PMAIC, and that providing such notice is a condition precedent to coverage. *Compare to Kimbrell v. Union Standard Ins. Co.*, 207 F.3d 535, 537 (8th Cir. 2000) (analyzing similar notice language in a policy of insurance and finding that it constituted a condition precedent); *see also Fireman's Fund Ins. Co. v. Care Mgmt.*, 2010 Ark. 110, at *10-11 ("In sum, it is well-settled law in Arkansas that an insured must strictly comply with an insurance-policy provision requiring timely notice where that provision is a condition precedent to recovery. Failure to do so constitutes a forfeiture of the right to recover from the insurance company, regardless of whether the insurance company was prejudiced by the failure."); *Ramey v. State Farm Mut. Auto. Ins. Co.*, 54 Ark. App. 307, 309-10 (1996) ("As a general rule, there can be no waiver of an insured's noncompliance with such a [notice] provision where the insurer does not have knowledge of all the material facts . . . . The purpose of provisions requiring the insured to inform the insurer of suits filed is to afford the insurer the opportunity to defend on the merits of the case." (internal citation omitted)).

Here, PMAIC maintains, and BNSF does not dispute, that Saint Trans failed to provide PMAIC with notice of the lawsuit that BNSF filed against Saint Trans in state court, and, further, that PMAIC first learned about this lawsuit *after* default judgment had been

entered in the underlying action.  BNSF argues instead that Saint Trans' failure to give notice to PMAIC should not be considered by the Court to be "a material fact," (BNSF's Statement of Facts in Response, Doc. 42, p. 3, ¶ 28), given that "Saint Trans was relieved of its obligation to inform PMA[IC] of the service of a summons because PMA[IC] had already denied coverage to Saint Trans," (Doc. 41, p. 8).  In other words, BNSF argues that the failure to provide notice is a non-issue because PMAIC waived the notice obligation when it notified Saint Trans that it was denying coverage for the claim.

BNSF cites to an Arkansas Supreme Court case called *Dixie Auto Ins. Co. v. Goudy*, 238 Ark. 432, 436 (1964), for the proposition that PMAIC's denial of coverage should constitute a waiver of Saint Trans' notice requirement.  Upon reviewing that case, however, the Court finds that the decision was factually driven, and the facts in the case at bar do not lead to the same conclusion.  In *Dixie Auto*, there was a car accident caused by Dixie Auto's insured, which resulted in damage and injuries to the other driver.  *Id.* at 433.  The insured gave notice to Dixie Auto of the accident and of the other party's claim for damages, but never put the insurance company on notice of the filing of the lawsuit. *Id.* at 436.  After a default judgment was entered against the insured, he filed suit against Dixie Auto, demanding coverage.  Certain exhibits introduced in the coverage trial showed that Dixie Auto had previously advised the insured in a letter that "there would be no coverage," and that it would contact the attorney for the accident victim to advise that "there is no coverage." *Id.*  The Court noted that Dixie Auto "did not contend it counteracted or modified the above reports" with any explicit reservations of its rights.  *Id.*

Under those circumstances, the Court found that the insurer had waived the notice

requirement under the policy, as "there was substantial evidence to sustain a finding that

[Dixie Auto] disclaimed all liability," *id.*, and there was a further finding that it "would have

been a vain and useless thing" to require the insured to give notice to Dixie Auto about the

state court lawsuit, *id.* at 437.

 In contrast to the above facts, PMAIC conveyed to Saint Trans that it did not waive

the notice requirement of the Policy.  In the January 27, 2015 letter from PMAIC to Saint

Trans, the insurance company included the following language:

> This Denial of Coverage is not exclusive but is rather the specific reasons of
> which PMAIC is presently aware.  By virtue of this correspondence, *PMAIC
> intends to reserve their rights on all grounds*, not only those set forth in this
> letter.  PMAIC expressly reserves the right to supplement, amend, modify or
> expand this Denial of Coverage for any additional reason as it may apply to
> any new facts or circumstances.
>
> *In the event you have any other information or documentation, which you
> want us to consider, immediately forward such information to our office.*  In
> the event any additional information or documentation would suggest that
> coverage would be afforded under the Terms and Conditions of this Policy,
> PMAIC expressly reserves the right to assert other and further grounds for
> denial in response to such information.

(Doc. 34-7, pp. 2-3 (emphasis added)).

 BNSF points to other letters that PMAIC sent to it—not to Saint Trans—regarding

PMAIC's refusal to pay for the loss, and BNSF argues that these statements, which in

PMAIC's view unequivocally deny the possibility of coverage, should inure to the benefit

of Saint Trans and create a waiver of Saint Trans' notice obligations under the contract.

 Ordinarily, waiver is presented as an affirmative defense to a cause of action.  *See*

Fed. R. Civ. P. 8(c).  Here, it is being asserted by BNSF in response to PMAIC's Motion

for Summary Judgment.  The Court will therefore examine the facts that support BNSF's

waiver argument in the light most favorable to BNSF, considering its position as non-

movant on summary judgment, and will give BNSF the benefit of any inferences that may be drawn from these facts. *See Union Elec.*, 135 F.3d at 1212-13.

According to the Eighth Circuit's decision in *Kimbrell v. Union Standard Insurance Co.*, which clarified the pronouncements made in *Dixie Auto*, when an insured "can show that the insurer's denial of coverage induced the failure to comply with the notice provisions," the insurer may be estopped from disclaiming liability due to the insured's failure to comply with the insurance policy's notice requirements—particularly if the insurer previously made unequivocal statements to the insured in which it denied "all coverage." 207 F.3d at 538. But in order to find that an insurance company *waived* its insured's contractual notice obligation, at least some evidence must show that the insurer "intentionally relinquished a known right"—namely, the right to require its insured to give it notice of a pending lawsuit. *Id.* In some cases, the communications between an insurer and its insured could establish a waiver. But when an insurer's "denial letter, which specifically disavow[s] an intent to waive any of the policy provisions," is sent to the insured, this evidence "cannot support a finding of waiver." *Id.*

After considering the evidence submitted by the parties concerning the issue of waiver, it is clear from PMAIC's correspondence with Saint Trans that it did not waive the notice requirement, and the Court finds that there is no genuine, material dispute of fact as to this point. Instead, PMAIC's January 27, 2015 letter to Saint Trans put it on notice that PMAIC had "reserve[d] their rights on all grounds" and advised Saint Trans to "immediately forward" any other information or documentation concerning the claim. (Doc. 34-7). Not only that, PMAIC's January 23, 2015 letter to BNSF, in which PMAIC refused

"to accept responsibility for the cargo," contained an explicit statement to the effect that "PMAIC reserve[d] all rights and [did] not waive any duties or obligations *of the Insured*." (Doc. 42-2 (emphasis added)).  PMAIC continued to correspond with BNSF after January of 2015 and participated in the investigation of the damaged cargo, but on March 6, 2015, sent an email to BNSF, noting that "coverage for this loss was declined" and that the company "will not be involved in the disposition of the Salvage or payment of the charges." (Doc. 42-4).  What is important to distinguish, however, between PMAIC's various communications with BNSF and PMAIC's letter to Saint Trans, is that PMAIC made a point of informing its insured that it did not waive the notice requirement.  Further, any statements PMAIC made directly *to BNSF* cannot possibly waive *Saint Trans'* requirements under the contract.

Examining the evidence in light of the Policy's notice requirement, the Court finds as a matter of law that it would not have been a "vain and useless thing" for Saint Trans to apprise PMAIC as to the existence of the state court lawsuit involving Red Rose and BNSF.  Summary judgment is therefore granted in PMAIC's favor, due to the fact that Saint Trans failed to comply with a condition precedent to coverage, and PMAIC did not waive its right to the fulfillment of this condition.

### B. NIC's Motion for Summary Judgment

NIC's Motion for Summary Judgment rests on three arguments.  The first is that the underlying state court judgment is void *ab initio* because NIC's insured, Red Rose, was never properly served with the complaint.  The second argument is that Red Rose's Policy did not cover the Saint Trans truck that was involved in the accident, and that is the subject

of the state court judgment.  The third argument is that Ark. Code Ann. § 23-89-101, upon which BNSF has relied in bringing a direct action for subrogation against NIC, only applies to insurance policies that are "issued or delivered in this state," and NIC maintains that its Policy was neither issued nor delivered in Arkansas.  As the Court finds that summary judgment is appropriate based on the third argument alone, this Order will not discuss the first and second arguments

NIC contends that the case against it should be dismissed because the Policy was neither issued nor delivered in Arkansas, and Ark. Code Ann. § 23-89-101 requires that a direct action for coverage be brought only with respect to a "policy of insurance issued or delivered in this state."  Ark. Code Ann. § 23-89-101(a).  In response, BNSF, which maintains its principal office in Arkansas, fails to offer any proof to counter NIC's assertion that Red Rose's Policy was issued in Nebraska and delivered in Indiana.  Instead, BNSF argues that perhaps the Court should construe the Policy as having been issued or delivered in Arkansas simply because NIC is registered to do business in Arkansas. *See* Doc. 43, p. 7. The Court rejects this argument, as it is entirely unsupported by citations to legal authorities, and the statute quite clearly refers to *the policy as* being "issued or delivered" in Arkansas, and not to the issuing insurance company being registered in the state.

The legislative intent of § 23-89-101 has been discussed in other cases.  For example, the Eighth Circuit in *Ferrell v. West Bend Mutual Insurance Co.* observed that the statute "permits those Arkansas residents who have been issued or presented with policies in Arkansas to sue their insurers in Arkansas, rather than some other jurisdiction, and prevents insurance companies from using forum selection clauses to require Arkansas

14

policyholders to litigate in inconvenient forums."  393 F.3d 786, 792 (8th Cir. 2005).  In

*Ferrell*, certain Arkansas tomato growers sued Hi-Tech Film, Inc., a company that

manufactured a plastic film that was intended to prevent soil from splashing onto plants

and causing blight.  *Id.* at 789.  According to the tomato growers, the film was ineffective

and actually caused damage to their crops.  *Id.*  A jury decided the matter of liability in the

growers' favor, and the growers obtained a judgment against Hi-Tech for damages and

attorney's fees.  *Id.*  With judgment in hand, the growers then filed a direct action in the

District Court for the Western District of Arkansas[1] against Hi-Tech's insurer, West Bend

Mutual Insurance, seeking subrogation under § 23-89-101, and requesting a bench trial on

the issue of coverage.  Interestingly, the Eighth Circuit's opinion noted that the tomato

growers, "[r]ecognizing that the Hi-Tech policy was neither issued nor delivered in

Arkansas, . . . abandoned at trial their reliance on the direct action statute," but proceeded

to trial on their alternative argument "that the insurance policy's express language provided

a basis for the action."  *Id.* at 792.

In comparing the *Ferrell* case to the instant one, it appears that BNSF, though

apparently an Arkansas citizen, must also come to terms with the fact that it is not

permitted to bring this subrogation action under § 23-89-101, since there is no material

dispute of fact that Arkansas was not the place of issuance or delivery of NIC's Policy.  The

argument does not end there, however.  In similar fashion to the tomato growers in *Ferrell*,

BNSF also contends that the Policy itself provides a separate basis for bringing this direct

action.  *See* Doc. 43, p. 6.  The provision that BNSF relies on is found in an endorsement

---

[1] The Hon. Harry F. Barnes presiding.

to the Policy,[2] which states that NIC "agrees to pay . . . any final judgment recovered against the insured for bodily injury to or death of any person, or loss of or damage to property of others." (Doc. 38-3, p. 31).  On first glance, this provision would appear to create a separate basis for BNSF to bring its coverage action, except that it is cabined by the following parenthetical: "(excluding . . . property transported by the insured, designated *as cargo*)." *Id.* (emphasis added).   Flipping to the portion of the Policy describing "Cargo Coverage," it provides that "[n]o one may bring any legal action against us under this coverage unless . . . (c) With respect to your liability for 'loss' to 'cargo' owned by others, there has been an 'agreed settlement' or a final judgment against you obtained *after an actual trial.*" *Id.* at p. 83 (emphasis added).

Because the state court judgment was issued following Saint Trans' default, not after an actual trial, it is clear that the Policy fails to provide a separate legal basis for bringing this subrogation action.  Without such a basis, the Court is left with no option but to grant summary judgment to NIC on this issue.  No direct subrogation action may be brought concerning this NIC Policy—in Arkansas, under § 23-89-101—and the case against NIC must be dismissed on that basis.

### IV. CONCLUSION

In light of the above reasoning, **IT IS ORDERED** that Defendant Pennsylvania Manufacturers Association Insurance Company's Motion for Summary Judgment (Doc. 34) is **GRANTED**, and Defendant National Indemnity Company's Motion for Summary

---

[2] An endorsement "becomes a part of the insurance contract as if it were actually incorporated therein." *Schultz v. Farm Bureau Mut. Ins. Co.*, 328 Ark. 64, 71 (1997).

Judgment (Doc. 37) is also **GRANTED**.  Although the Third Party Complaint (Doc. 15) is still technically pending, it seeks the same relief as has been awarded in this Order, and therefore, the Court deems it **MOOT** and **DISMISSED**.  Judgment will enter accordingly.

**IT IS SO ORDERED** on this _22nd_ day of February, 2017.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

17